**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| LEVI GIBSON, | : | Case No. 1:19-cv-00283-MWM |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| THE SELINKSKY FORCE, LLC, et al. | : | |
| | : | |
| Defendants. | : | |

---

**ORDER GRANTING DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT (DOCS. 40, 41)**

---

This matter is before the Court on Defendant Dynegy Zimmer LLC's ("Dynegy")

Motion for Summary Judgment (Doc. 40) and Defendant The Selinsky Force, LLC's

("Selinsky") Motion for Summary Judgment (Doc. 41). Plaintiff filed his Responses in

Opposition (Docs. 47, 48, respectively), to which each Defendant filed a Reply (Docs. 49,

50). Subsequently, Dynegy filed a Notice of Supplemental Authority (Doc. 52) for the

Court's consideration. Thus, this matter is ripe for the Court's review. For the reasons

below, Defendants' Motions are **GRANTED**.

### FACTS

This lawsuit arises from an accident at the William H. Zimmer Power Station

("Zimmer Station"), then owned and operated by Dynegy, which resulted in injuries to

Plaintiff. (Dynegy Statement of Proposed Undisputed Facts, Doc. 40-1, at ¶ 1.) At that

time, Plaintiff was employed by Defcon Force LLC ("Defcon"), and Selinsky was the

parent company of Defcon. (*Id.* at ¶¶ 2-3.) Defcon specialized in performing work on pulverizers at coal power plants. (*Id.* at ¶ 4.) A pulverizer is a large piece of machinery that crushes coal into dust. (*Id.* at ¶ 5.)

In 2010, Selinsky purchased Defcon. (Selinsky Statement of Proposed Undisputed Facts, Doc. 41-2, at ¶ 17). Selinsky contends that, thereafter, the companies continued to run separately and independently, as they had prior to the acquisition, except that Selinsky handled Defcon's accounting. (*Id.* at ¶ 18.) According to Selinsky, Defcon continued to use its own standard operating procedures in furtherance of its business, including how work was performed on pulverizers. (*Id.* at ¶ 21.) Indeed, Selinsky indicates that its safety director was not tasked with responsibility over, or enforcement of, Defcon's safety program. (*Id.* at ¶¶ 23; 27.) Nor did Selinsky provide or implement its safety policies to Defcon, train Defcon on its safety policies, nor enforce its safety policies on Defcon. (*Id.* at ¶ 28.)

Plaintiff describes the relationship between Defcon and Selinsky differently, especially as it pertains to safety, relying almost entirely on the deposition of Joseph Dimel, Defcon's division manager. According to Plaintiff, Defcon did not have its own safety program and instead, Defcon employees relied on Selinsky's safety program. (Deposition of Joseph Dimel ("Dimel Dep."), Doc. 37, at Pg. ID 512, 30:22-31:8). Mr. Dimel described the Selinsky program as "a health and wellness safety program." (*Id.* at Pg. ID 512, 31:22-23.) When asked about the training Selinsky provided, Mr. Dimel explained that Selinsky's safety director "would come down and do the manager safety orientation,

. . . twice a year." (*Id.* at Pg. ID 513, 35:19-36:3.) Selinsky would also periodically receive signed job safety sheets from Defcon employees. (*Id.* at Pg. ID 514, 38:24-39:13.)

Since he began working for Defcon, Plaintiff performed pulverizer rebuilds or preventative maintenance on pulverizers at several different coal plants, including Zimmer Station. (Dynegy Statement of Proposed Undisputed Facts, Doc. 40-1, at ¶ 7.) Plaintiff did not receive any formal training from Defcon at any time prior to the accident. (*Id.* at ¶ 8.) Instead, any training Plaintiff received was from the local millwright union or on-the-job training from the Defcon foreman. (*Id.* at ¶ 10.) In fact, Plaintiff learned how to perform pulverizer preventative maintenance and rebuilds by watching other Defcon employees perform the work and from instructions provided by the Defcon foreman. (*Id.* at ¶ 11.) Plaintiff never saw any Selinsky safety policies nor did he communicate with anyone from Selinsky prior to his accident. (Selinsky Statement of Proposed Undisputed Facts, Doc. 41-2, at ¶ 4,8.)

Beginning in March of 2017, and continuing into April, Defcon performed preventative maintenance on the pulverizers at Zimmer Station. (Dynegy Statement of Proposed Undisputed Facts, Doc. 40-1, at ¶ 17.) Pulverizer preventative maintenance consists of performing general inspections, oil changes, welding, and repairs on the inside of the pulverizer mill. (*Id.* at ¶ 12.) When performing the preventative, the worker must work from an elevated position to open the maintenance door on the side of the pulverizer and access the inside. (*Id.*)

Defcon's method for accessing a pulverizer door was to elevate the employee in a man basket that it made. (*Id.* at ¶ 13.) So, to do that, Defcon's practice was to attach the

man basket to a forklift using a metal rope threaded through an eye bolt on the man basket and wrapped around the mast of the forklift. (*Id.* at ¶ 14.) When elevating employees in the man basket, to act as fall protection, Defcon would attach a six-foot lanyard to an eyelet on the inside of the man basket itself and the worker would wear a harness. (*Id.* at ¶¶ 15-16.)

Defcon, through its foreman, Mr. Johnson, performed a job safety analysis every morning, which involved Mr. Johnson reviewing with the Defcon crew the work they would be doing each day and the potential risks and hazards. (Selinsky Statement of Proposed Undisputed Facts, Doc. 41-2, at ¶ 11.) These meetings usually lasted five to ten minutes and occurred in Defcon's trailer. (Dynegy Statement of Proposed Undisputed Facts, Doc. 40-1, at ¶¶ 23-25.) Mr. Johnson would complete a Selinsky job safety analysis form and submit the form, signed by the crew, to Selinsky. (*Id.* at ¶¶ 26-27.) Occasionally, Dynegy's contractor liaison or on-site safety specialist would attend the job safety analysis meetings. (*Id.* at ¶¶ 29-31.)

Dynegy did not have a policy regarding how contractors should open pulverizer doors, including how the contractors should be elevated. (*Id.* at ¶ 18.) Nor did Dynegy approve Defcon's use of equipment that Defcon used to perform its work at Zimmer Station or instruct Plaintiff how to perform his work. (*Id.* at ¶¶ 20, 33.) Carolyn Burch, Dynegy's on-site safety specialist, had the authority to stop work if she observed a contractor engaging in an unsafe practice, but she never saw Defcon use a man basket attached to a forklift. (*Id.* at ¶¶ 35-36.)

Similarly, Selinsky did not inspect the man basket nor provide any training relating to it. (Selinsky Statement of Proposed Undisputed Facts, Doc. 41-2, at ¶ 30.) In fact, Selinsky's safety director did not know the man basket existed. (*Id.* at ¶ 47.)

Furthermore, Selinsky was not involved in the Zimmer Station project at all prior to the accident. It did not visit Zimmer Station during the project, and Selinsky's safety director was not aware that Defcon was even working at Zimmer Station, let alone what work Defcon was performing there. (*Id.* at ¶¶ 39, 43-44.) Thus, Selinsky's safety director never inspected Defcon's work at Zimmer Station, nor did he perform a worksite hazard assessment for Defcon's work there. (*Id.* at ¶¶ 45-46.) In fact, Selinksy never conducted a safety audit of Defcon. (*Id.* at ¶ 35.)

The accident precipitating this lawsuit occurred on April 19, 2017. By this date, Defcon had already performed preventative maintenance on nine pulverizers, and Plaintiff had been on the project for three or four weeks. (*Id.* at ¶¶ 9-10.) On this morning, Mr. Johnson performed a job safety analysis, on which Plaintiff signed off. (*Id.* at ¶¶ 12.)

Plaintiff admits he did not check to make sure that the man basket was attached to the forklift with the metal cable prior to Mr. Johnson elevating the basket. (*Id.* at ¶ 13.) After Mr. Johnson lifted Plaintiff in the man basket, the basket slid off the tines of the forklift. (*Id.* at ¶ 14.) The man basket, along with Plaintiff, fell to the ground resulting in Plaintiff's injuries. (*Id.*)

**LAW**

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Dynegy (the coal power plant owner) and Selinsky (the parent company of Plaintiff's employer) each filed a motion for summary judgment on the negligence claims Plaintiff asserted against each of them. To prevail on a claim for negligence, Plaintiff must prove the following elements: (1) the existence of a duty owed by the defendant to

the plaintiff, (2) the breach of duty, (3) causation, and (4) damages. *Hudzik v. Boulevard Ctr. Co.*, 103 N.E.3d 131, 135 (Ohio Ct. App. 2017).

## ANALYSIS

**A.    Selinsky's Motion for Summary Judgment (Doc. 41)**

As Defcon's parent company, Selinsky argues that it did not owe a duty of care to Plaintiff because it is a separate corporate entity from Defcon and did not undertake to render services to Plaintiff or for his benefit.  Moreover, even if Selinsky had rendered such services, its conduct did not increase the risk of harm to Plaintiff, it did not supplant Defcon's duty, and neither Plaintiff nor Defcon actually and detrimentally relied upon such undertaking.

Generally, under Ohio law, a parent corporation is not liable for the negligent acts of its subsidiaries under the doctrine of *respondeat superior*. *Thompson v. Superior Fireplace Co.*, 931 F.2d 372, 374 (6th Cir. 1991).  A parent, however, may be held liable to its subsidiary's employees for its own independent acts of negligence.  *Id*.

The parties appear to agree[1] that Section 324(A) describes the potential basis for Selinsky's duty in this case.  Section 324(A) provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for

---

[1] Plaintiff argues in passing that Selinsky may have a duty pursuant to the fundamental principles of tort law, that is, if a reasonable person could foresee that an injury might occur from a particular act, then the law imposes a duty upon that person to act with due care in the performance of the act. (Response, Doc. 47, Pg. ID 1201.)  Along those same lines, Plaintiff also suggests that Selinsky may be held liable in tort for its own acts.  While these are generally accurate statements of the law, *see Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 663 (6th Cir. 1979), Plaintiff fails to identify any affirmative acts from which Selinsky's liability may arise.  To the contrary, the gist of Plaintiff's allegations are that Selinsky failed to take actions that would have prevented the accident, not that it took actions that caused it.

physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts (1965).

Although the Ohio Supreme Court has not ruled on whether Section 324(A) applies under these circumstances, several federal and state cases in Ohio support the conclusion that it would. *See Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 521 N.E.2d 780 (1988); *Stevens v. Jeffrey Allen Corp.*, 131 Ohio App.3d 298, 722 N.E.2d 533 (1st Dist. 1997); *Wissel v. Ohio High School Athletic Assn.*, 78 Ohio App.3d 529, 605 N.E.2d 458 (1st Dist. 1992); *see also Lapine v. Materion Corporation*, No. 1:16 CV 2119, 2016 WL 7033727 at fn. 2 (N.D. Ohio Dec. 2, 2016) (noting that Ohio courts apply Section 324A).

Moreover, when faced with this precise issue under Kentucky law, the Sixth Circuit held that the Kentucky Supreme Court would apply Section 324A. *Merrill ex rel. Est. of Merrill v. Arch Coal, Inc.*, 118 F. App'x 37, 44 (6th Cir. 2004). The Sixth Circuit noted that, under Kentucky law (just as under Ohio law), parent corporations could not be held liable under the doctrine of *respondeat superior* but could be held liable for their own independent acts of negligence. *Id.* The question then became whether the parent corporation has committed independent acts giving rise to a duty of care to the plaintiff. The Sixth Circuit reasoned that the Kentucky Supreme Court would use Section 324A as the standard to determine when a parent corporation had done so.

8

The same logic applies here. Under these circumstances, the Ohio Supreme Court would need to make the same determination, and it would reasonably also turn to Section 324A of the Restatement (Second) of Torts to provide the standard. Accordingly, Section 324(A) applies here to determine whether Selinsky owed a duty to Plaintiff.

      **1.**      **Whether Selinsky Undertook to Render Services to Plaintiff**

The threshold question under Section 324A is whether the defendant undertook to render services to or for the benefit of the plaintiff. *Merrill*, 118 F. App'x at 44. The Sixth Circuit's decision in *Merrill* is instructive to the analysis of this question.

In that case, a mine employee was killed when a portion of the mine's roof collapsed. *Id.* at 38. The employee's wife and minor child sued the employee's employer and its parent company. *Id.* Following discovery, the parent company moved for summary judgment arguing that it had not undertaken a voluntary duty for the safety of its subsidiary's employees, and the district court granted the motion. *Id.* at 43.

The Sixth Circuit reversed summary judgment for the parent company because it found a question of fact existed as to whether the parent company's acts did, in fact, undertake a voluntary duty. *Id.* at 45. Specifically, the Sixth Circuit acknowledged that a "general corporate-wide safety program, safety awards and general safety guidelines are insufficient to create a duty on [its] part." *Id.* at 44. But the court noted that the parent company had performed specific actions that "went beyond mere oversight or consultation." *Id.* The parent company had taken actions specifically directed to remedy the safety issue that ultimately caused the plaintiff's injuries, including visiting the mine, examining the mine's roof, offering advice about roof control, and ultimately concluding

the roof system was adequate. *Id.* at 45-46 (citing *Johnson v. Abbe Eng'g Co.*, 749 F.2d 1131, 1133 (5th Cir. 1984) (parent corporation's duty to protect its subsidiary's employees arises "when the defendant has 'undertaken to inspect the specific instrument causing the injury or to inspect the entire plant of which that instrument was a part.'"))

Other decisions have similarly focused on the nature of the parent corporation's actions (active versus passive), the scope of the parent corporation's actions (general versus specific) and even when specific, whether the actions pertained to the instrumentality that caused the injury at issue. *See McAtee v. Fluor Constructors International, Inc.*, No. 98-5927, 1999 WL 685928, *6 (6th Cir. Aug. 27, 1999) (concluding that broad allegations that the parent company was responsible for "plant safety" was insufficient under Section 324(A), instead requiring evidence that the parent company "specifically undertook to render safety services with respect to Plaintiff's work near [the instrumentality that caused his injury]"); *Lapine v. Materion Corp.*, Case No. 1:16cv2119, 2016 WL 7033727, *4 (N.D. Ohio Dec. 2, 2016) (granting a motion to dismiss because the plaintiff based his claim against the parent company of the employer on that entity's inaction, which the court concluded undermined his position that the parent company had assumed a duty).

The undisputed facts in this case show that Selinsky did not undertake any duty as to Plaintiff's safety in relation to the man basket. The evidence shows that, at most, Selinsky implemented a high level, general corporate-wide safety program. For example, Mr. Dimel, Defcon's Operation and Division Manager, testified that someone from Selinsky would perform management level training twice a year. And he even referred

10

to the Selinsky safety program as a health and wellness safety program. Twice a year manager safety orientation cannot be construed to mean that Selinsky undertook to render safety and training related services to Defcon and its employees.[2] Moreover, Mr. Dimel's characterization of the safety program is akin to the high-level, general corporate safety programs that the Sixth Circuit has confirmed does not constitute undertaking a duty under Section 324A. *See Merrill*, 118 F. App'x at 44. Moreover, Plaintiff elsewhere admits that he received on-the-job training at Defcon and that Defcon conducted its own site-specific training at jobsites and conducted job safety analyses.

Furthermore, Plaintiff can point to no evidence that Selinsky undertook any responsibility for the safety of the work basket or employees using the work basket. Mr. Dimel's testimony reflects only that he assumed Selinsky would be responsible for ensuring OSHA compliant equipment. (*See* Doc. 37 at PageID# 516) (responding when asked if he agreed that the safety department at Selinsky would have been responsible for ensuring that the men were working on OSHA compliant equipment, "I would assume so.") Furthermore, that question pertains generally to equipment—not the man basket in question.

In any event, Plaintiff elsewhere admits that "Selinsky never inspected the man basket or provided training related to it," and that Selinsky's safety director "did not know the man basket existed." (Selinsky Statement of Proposed Undisputed Facts, Doc. 41-2, at ¶¶ 30, 47.) He further acknowledges that Selinsky's safety director did not

---

[2] While Plaintiff argues that Selinsky has a very specific safety program, the specifics of Selinsky's own safety program has no bearing on whether it ever rendered services to protect Defcon's employees. Indeed, the testimony confirms Selinsky did not.

perform a safety audit or inspection of the work to be performed by Defcon at the Zimmer Power Plant." (*Id.* at ¶ 45-46.)  Indeed, any involvement by Selinsky with Defcon did not occur until after Plaintiff's accident.  (Doc. 35 at Pg. ID 341-42.)

Plaintiff's reliance on the testimony of his expert, James McIntosh, to survive summary judgment is misplaced.  Mr. McIntosh's opinion relies on OSHA standards in finding that Selinsky had a duty to prevent Plaintiff's injuries.  OSHA, however, conducted an investigation after the incident and found only Defcon in violation of its standards, not Selinsky or any other entity.  Moreover, Mr. McIntosh opines on a legal question:  whether Selinsky had a duty to Plaintiff.  Thus, an opinion on this issue is improper.

In sum, Plaintiff fails to create a genuine issue of material fact regarding whether Selinsky undertook to provide services to Defcon such that it owed a duty to Plaintiff in this case.  Selinsky did not provide anything more than general oversight to Defcon, and certainly no services directed at the Zimmer Plant or the particular forklifts and baskets that led to Plaintiff's injuries.

## 2.    Section 324A's Other Requirements

Even if, under these circumstances, Plaintiff created a genuine issue regarding whether Selinsky undertook to provide services on his behalf, he would still need to meet one of Section 324A's other elements.  Those elements are that (a) the failure to exercise reasonable care increased the risk of harm, (b) the defendant has undertaken to perform a duty owed by another to the plaintiff, or (c) the harm is suffered because of reliance of

the other or the plaintiff upon the undertaking.  As discussed below, Plaintiff is unable to create a genuine issue as to any of these elements.

As to any alleged increase in the risk of harm, "[t]he test is not whether the risk was increased over what it would have been if the defendant had not been negligent," but rather whether "the risk was increased over what it would have been had the defendant not engaged in the undertaking at all." *Sagan v. U.S.*, 342 F.3d 493 (6th Cir. 2003) (quoting *Myers v. United States*, 17 F.3d 890, 903 (6th Cir.1994).  Plaintiff erroneously premises his arguments on what the risk would have been if Selinsky had not been negligent.  But this presumes the existence of the duty.  He thus fails to create a genuine issue as to this element.

Under the second alternative, Plaintiff would need to show that Selinsky had undertaken a duty owed to him by Defcon.  The caselaw as to this element is clear, however, that the defendant's undertaking must supplant, not merely supplement, the other's fulfillment of the duty in question.  It is undisputed that Defcon provided some on-the-job and site-specific training to its employees.  Thus, Selinksy clearly did not supplant Defcon's safety efforts.

Under the last alternative element, Plaintiff must show reliance on Selinsky's undertaking.  However, Plaintiff does not claim to have personally relied on Selinsky's safety training or policies.  To the contrary, Plaintiff admits he never saw a Selinsky safety policy, nor did he ever speak to anyone at Selinsky prior to his accident.  Instead, he argues that Defcon did.  Yet there is no evidence that Selinsky undertook any action to ensure the safety of the baskets, or that Selinsky even knew that Defcon was performing

13

any maintenance at the Zimmer Station. As such, Defcon could not have relied on Selinsky to ensure the safety of its employees at the plant when Selinsky did not even know that they were there.

In Sum, Selinsky's Motion for Summary Judgment is well-taken. There is no genuine issue of material fact, and Selinksy did not, as a matter of law, owe Plaintiff a duty.

**B.      Dynegy's Motion for Summary Judgment (Doc. 40)**

Dynegy is the owner of the coal power plant, not Plaintiff's employer. Dynegy argues that, like a general contractor, it is not liable to Defcon's employees for Defcon's acts in the performance of the contracted work unless it actively participated in the work, which Dynegy argues it did not.

Plaintiff presents two arguments to avoid summary judgment. First, that Dynegy actively participated in Defcon's work. (*See* Response, Doc. 48, Pg. ID 1236.) Second, that Dynegy has duty under common law to provide Defcon workers a safe working environment or, at a minimum, to exercise care in performing a duty which it has undertaken (relying on Section 324A of the Restatement (Second) of Torts). (*See id.* at Pg. ID 1232-33.)

Taking the second argument first, Plaintiff cites no authority in support of its argument that Dynegy owed him a duty to provide a safe workplace—he relies only on the testimony of his expert who reviewed the record and opined that Dynegy owed a duty to Plaintiff that it breached.

While the expert's opinion might be helpful to the jury on the question of breach, whether a duty exists is a question of law to be decided by the Court. Moreover, the expert's opinion is based on OSHA and other standards irrelevant under the applicable Ohio law as noted above.

Importantly, Ohio law is clear that "[t]he duty owed to frequenters, *i.e.*, including employees of other companies, is no more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which he has knowledge." *Eicher v. U.S. Steel Corp.*, 512 N.E.2d 1165, 1167 (Ohio 1987). Such a duty "does not extend to hazards which are inherently and necessarily present because of the nature of the work performed, where the frequenter is the employee of an independent contractor." *Id*. Under such circumstances, the "primary responsibility" for protecting the employee of an independent contractor lies with the employer—i.e., the independent contractor. *Id*. at 1168; *accord Abbott v. Jarett Reclamation Servs.*, 726 N.E.2d 511, 518 (Ohio App. 1999).

Thus, based on this well-settled Ohio law, there can be no inherent duty for Dynegy, as the site owner/operator, to provide a safe workplace for Defcon's employees, unless it actively participated in the work or assumed such a duty. The Court will discuss each in turn.

### 1. Duty Arising from Active Participation

Generally, one who engages the services of an independent contractor generally owes no duty to protect the contractor's employees from dangers inherent to the job.

*Wellman v. East Ohio Gas Co.*, 113 N.E.2d 629, syllabus (Ohio 1953). Instead, only a company or general contractor that "actively participates" in the independent contractor's work owes a duty of care to the contractor's employees. *Cafferkey v. Turner Constr. Co.*, 488 N.E.2d 189, syllabus (Ohio 1986). "For purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project." *Bond v. Howard Corp.*, 650 N.E.2d 416, syllabus (Ohio 1995).

The critical question, then, is what constitutes "active participation" under Ohio law. Ohio cases illuminate general guidelines in answering this question. First, active participation occurs only where the owner requires a contractor perform a particular activity in a manner that causes injury or refuses to permit a safer alternative. *Hillabrand v. Drypers*, 2002-Ohio-5485, ¶ 18. Second, "'[a]ctive participation' does not include mere supervision of an independent contractor's work or exhibiting a general concern for safety." *Frost v. Dayton Power & Light Co.*, 740 N.E.2d 734 (Ohio App. 2000). Third, an owner's knowledge of an independent contractor's activities likewise does not constitute "active participation" for purposes of establishing liability for a resulting injury. *Cornell v. Mississippi Lime Co.*, 95 N.E.3d 923, 936 (Ohio App. 2017).

The undisputed facts in this case confirm that Plaintiff's injuries were caused by the manner in which Defcon had him perform maintenance work, not Dynegy.

### a. Direct or Control

First, Dynegy did not direct or control the activity that ultimately injured Plaintiff. "Ohio courts have specified that exercising control over an independent contractor's employees' workplace activities involves something akin to directing, instructing, or requiring that actions be performed by those employees in a certain way." *Jolly v. Dynegy Miami Fort, LLC*, 500 F. Supp. 3d 659, 671 (S.D. Ohio 2020).

Plaintiff argues that the following facts demonstrate that Dynegy actively participated in Plaintiff's workplace activities:

1. Requiring Defcon's employees to undergo Dynegy site orientation training;

2. Requiring Defcon's employees to comply with Dynegy site policies/procedures;

3. Having a Contractor Liaison (Bobby Leslie) attend Defcon's meetings and discuss specific job-related hazards with Defcon employees;

4. Having a Dynegy site safety specialist (Carolyn Burch) inspect and monitor Defcon's work from a safety standpoint;

5. Having a Contractor Safety Program in place which requires Dynegy to ensure that Defcon and its employees are competent, are properly trained and adhere to Dynegy site policies and procedures;

6. Having specific company policies in place (powered industrial trucks – forklift, fall protection, scaffolds, etc.) related directly to Defcon's work on the pulverizers, including a policy banning personnel from being lifted in a work basket with a forklift;

7. Having Dynegy's own employees perform preventative maintenance on the pulverizers from time to time and utilizing a scissor lift rather than a work basket attached to a forklift pursuant to Dynegy company policy;

8. Having the Dynegy Contractor Liaison several times witness the Defcon crew utilize a work basket attached to a forklift to elevate personnel to perform preventative maintenance on the pulverizers in violation of Dynegy company policy; and

9. Dynegy instructed Defcon regarding which pulverizers required maintenance and the scope of work for each one.

(*See* Response, Doc. 48, Pg. ID 1220-21.)

But, dispositively, none of the facts on which Plaintiff relies to establish a duty demonstrate that Dynegy directed, instructed, or required Plaintiff to perform the action that ultimately injured him in any particular way. To the contrary, most of these facts constitute mere supervision or a general concern for safety, (*see* 1-5 above), which is undeniably insufficient to constitute active participation. Dynegy's policies regarding machinery and how its own employees perform work on the pulverizers (*see* 6-7 above) do not show active participation as to how Defcon performed its operations. Rather, it shows that Dynegy had its own policies and did not actively control or participate in Defcon's work.

Further, the fact that Dynegy's Contractor Liaison observed Defcon's employees utilize the work basket attached to the forklift to elevate personnel to perform preventative maintenance on the pulverizers, which violated Dynegy company policy, (*see* 8 above) similarly does not establish active participation. Mere knowledge of the contractor's work, even a safety violation, does not amount to active participation. *Cornell v. Mississippi Lime Co.*, 95 N.E.3d 923, 936 (Ohio Ct. App. 2017). Finally, the fact that Dynegy informed Defcon which pulverizers needed maintenance and the scope of what needed to be performed similarly fails to show active participation, as this shows that Dynegy provided only the endpoint—not how Defcon needed to perform the work.

In sum, Plaintiffs do not raise a dispute of material fact that show that Dynegy exercised any control over the manner in which Defcon or Plaintiff performed work on the pulverizer.

### b. Exercise Critical Variables in the Workplace

Even when a property owner did not control the workplace activities related to the accident, courts may also find active participation when the property owner "exercise[d] control over a critical variable in the workplace." *Sopkovich*, 693, N.E.2d at 243. Nonetheless, "[a]n owner's knowledge of the dangerous conditions . . . and perhaps the necessity for further safety measures, does *not* constitute control over a critical workplace variable when the independent contractor has knowledge of the same facts." *Bell v. DPL, Inc.*, No. 98CA663, 1999 WL 713589, at *5 (Ohio Ct. App. Aug. 31, 1999) (emphasis in original). Instead, "critical variable analysis looks to the owner's control over 'the working environment,' rather than control over the actual activities the independent contractor's employees performed, as the basis for liability." *Jolly*, 500 F. Supp. 3d at 672 (citing *Sopkovich*, 693 N.E.2d at 244).

However, Plaintiff does not identify a variable that Dynegy controlled. Presumably, the relevant variable would be the forklift and work basket. But nowhere does Plaintiff argue or point to evidence showing that Dynegy controlled the forklift or work basket. To the contrary, the evidence shows that Defcon selected and supplied its own equipment, including the forklift and work basket. Again, mere supervision is insufficient to establish active participation.

## 2.  Safe Working Environment: Did Dynegy Assume a Duty?

As noted above, Section 324(A) generally governs the question of whether an entity assumes a duty.  Section 324(A) Restatement (Second) of Torts (1965).  As such, the threshold question is whether the defendant undertook to render services to or for the benefit of the plaintiff.  *Merrill*, 118 F. App'x at 44.  The Sixth Circuit has acknowledged that a "general corporate-wide safety program, safety awards and general safety guidelines are insufficient to create a duty on [its] part."  *Id.* But the performance of specific actions that "went beyond mere oversight or consultation" could create a duty. *Id.*  For example, when the parent company had taken actions specifically directed to remedy the safety issue that ultimately caused the plaintiff's injuries.  *See id.* at 45-46 (citing *Johnson v. Abbe Eng'g Co.*, 749 F.2d 1131, 1133 (5th Cir. 1984) (parent corporation's duty to protect its subsidiary's employees arises "when the defendant has 'undertaken to inspect the specific instrument causing the injury or to inspect the entire plant of which that instrument was a part.'"))

Here, as previously discussed, none of Plaintiff's arguments or even the expert's opinions go beyond identifying general corporate safety policies, supervision, or general concern for safety.  As such, they are insufficient to show that Dynegy assumed a duty. *See id.*; *McAtee v. Fluor Constructors International, Inc.*, No. 98-5927, 1999 WL 685928, *6 (6th Cir. Aug. 27, 1999) (concluding that broad allegations that the parent company was responsible for "plant safety" was insufficient under Section 324(A), instead requiring evidence that the parent company "specifically undertook to render safety services with respect to Plaintiff's work near [the instrumentality that caused his injury]").

**CONCLUSION**

For the reasons discussed above, Defendants' Motions for Summary Judgment

(Docs. 40, 41) are **GRANTED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND